UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL CLARK,

          Plaintiff,

v.

MARGARET QUELLETE and
UNKNOWN PARTY,

          Defendants.

Case No. 1:24-cv-823

Hon. Hala Y. Jarbou

_____/

### REPORT AND RECOMMENDATION

*Pro se* plaintiff Michael Clark is a prisoner in the custody of the Michigan Department of Corrections (MDOC). Plaintiff injured his head in August 2023 at the MDOC's Lakeland Correctional Facility (LCF) and experienced vision problems. Plaintiff filed this action pursuant to 42 U.S.C. § 1983, alleging that defendant PA Margaret Ouellette (named as "Quellete") and an unknown LCF optometrist were deliberately indifferent to his serious medical needs from October 2023 through June 2024. This matter is now before the Court on defendant PA Ouellette's motion for summary judgment (ECF No. 40).

### I.      Plaintiff's allegations

Plaintiff does not set forth any facts regarding his injury or treatment received prior to October 2023. Plaintiff's allegations begin on October 23, 2023, when he sent a health care request "regarding the defect that he had in his vision (eyesight)." *See* Compl. (ECF No. 1, PageID.2-3). Plaintiff received a response from non-party "Decker, Mara" stating that "Inmate is on the optometry list. Watch for call out." PageID.3. Plaintiff alleged that "there was no call out." *Id.*

1

On October 31, 2023, plaintiff sent out another health care request "expressing the fact that the matter was urgent and Plaintiff was suffering from a [sic] defective vision." *Id*. Non-party "Schults Mary" responded stating, "NV requested." *Id*.

Plaintiff does not allege any activity in November 2023, December 2023, January 2024, or February 2024. *See id*. During this time period, plaintiff received medical treatment for his vision problem. As discussed, *infra.*, the medical records establish that in November and December 2023: plaintiff saw an optometrist to evaluate his vision; plaintiff received an attachment for his glasses to treat the double vision; the optometrist referred plaintiff to a specialist (an ophthalmologist); and plaintiff had two appointments with PA Ouellette.

Plaintiff resumes his allegations on March 1, 2024, when he "sent another health care request, requesting to see the optometrist (John Doe) explaining that Plaintiff's vision hasn't improved." PageID.3. Non-party Decker responded that, "offsite is approved watch for call out." *Id*. Plaintiff alleged that "there was no call out for treatment." *Id*.

On March 19, 2024, "Plaintiff sent another health care request regarding his blurred, double vision." *Id*. Non-party "Mikel Nathan" responded, "Your offsite appointment has been scheduled. If you are still having issues you need to kite optometry." *Id*. While plaintiff does not allege that he received any further treatment, the medical records reflect that the ophthalmologist evaluated plaintiff in April 2024, that plaintiff requested eye surgery, and that he received the surgery in June 2024. *See* discussion, *infra*.

Plaintiff summarized his claim against PA Ouellette and the unknown optometrist as follows,

> Plaintiff contends that from October 2023 to June 26, 2024, when plaintiff had his eye surgery is [sic] eight (8) months, and eight months is a very long time for any human being to suffer in the way Plaintiff has suffered, literally without eyesight.

2

PageID.3.  Plaintiff alleged that this was an emergency health need: he could not see anything; he would fall down to the ground and injure his head; he would have headaches and dizzy spells; he would bump into the wall; he would trip over rocks on the ground or objects on the floor; and that he would urinate on the floor because he was unable to see the urinal.  *Id*.  While plaintiff did not allege that PA Ouellette engaged in any particular misconduct, he contends that PA Ouellette and the unknown optometrist violated his Eight Amendment rights because they "were deliberately indifferent to Plaintiff's emergency medical need by treating Plaintiff's medical needs as non-urgent, and refusing to inform the specialist of the seriousness of Plaintiff's medical emergency." *Id*.  Plaintiff wants a declaratory judgment, injunctive relief, and monetary damages.  *Id*. at PageID.5.

### II.     Defendant PA Ouellette's Motion for summary judgment

### A.     Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d  at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party."  *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B.    Eighth Amendment claim

### 1.    Legal standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law."  *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law.  *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § 1983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97 (1976).  A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  A court considering such a claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and

if the officials acted with a sufficiently culpable state of mind.  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition.  *Id*. at 8-9.  "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id*. at 9.  "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (internal quotation marks omitted). "[T]his care qualifies as 'cruel and unusual' only if it is 'so grossly incompetent' or 'so grossly inadequate' as to 'shock the conscience' or 'be intolerable to fundamental fairness.'" *Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021).  "For prisoners to prove grossly inadequate care, moreover, courts generally require them to introduce medical evidence, typically in the form of expert testimony." *Id*.  In short, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety.  *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Mere negligence in diagnosing or treating a medical condition does not constitute an 8th Amendment violation.  *Id*. at 835. "It is obduracy and

5

wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  Stated another way, the plaintiff must prove that each defendant acted with a "sufficiently culpable state of mind, equivalent to criminal recklessness." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839-40) (internal quotation marks omitted).

### 2.        Plaintiff's injury and treatment prior to October 23, 2023

On August 13, 2023, plaintiff suffered head trauma, *i.e.*, a "[c]erebral contusion with loss of consciousness", after he collided with another inmate during a softball game at LCF. Medical Records (ECF No. 40-1, PageID.283-284).  Plaintiff was admitted to an outside hospital on that date and discharged on August 16, 2023.  *Id*. at PageID.283-287.

After discharge, plaintiff received treatment at the MDOC's Dwayne Waters Hospital (DWH). PageID.288-374. On August 23, 2023, plaintiff was scheduled for an optometry visit in two weeks or sooner due to his complaint of double vision.  PageID.347.

On September 6, 2023, an optometrist evaluated plaintiff.  PageID.361-363.  The optometrist noted "Vertical diplopia since head trauma" with a plan to treat the problem with a Fresnel prism.  PageID.361-362.[1]

On September 11, 2023, William Hooker OD saw plaintiff but could not attach the device noting:

> Was in clinic to have Fresnel prism put on glasses. He reported he does not have his property yet and thus doesn't have his glasses. He did report the double is getting a little better at near but not at distance.  I advised to kite when he receives his glasses so we can see if still needs the prism. Also advised to try to make things single at near and to work focus out further to see if helps.

---

[1] "Fresnel prisms are thin, flexible, polyvinyl chloride (PVC) sheets, typically 1mm thick, featuring, miniature grooves applied to eyeglasses to correct strabismus, diplopia (double vision), and hemianopia."  Defendant's Brief (ECF No. 40, PageID.271, fn. 2).

PageID.364.

On September 21, 2023, a neurology provider noted the following assessment and plan:

**1) Intraparenchymal hematoma of brain due to trauma, with unknown loss of consciousness status, unspecified laterality, subsequent encounter (ICD-10: S06.33AD)**

No evidence of hematoma or contusion on today's imaging [Head CT].
Patient is neurologically intact.
Patient reports diplopia with distance vision that is not present when he wears his glasses.
Patient should follow up with a ophthalmologist or optometrist to evaluate his vision.
RTC as needed

**2) Contusion of cerebrum, with unknown loss of consciousness status, unspecified laterality, subsequent encounter (ICD-10: S06.33AD)**

See above

PageID.356.

On September 25, 2023, plaintiff was discharged from DWH. PageID.371-373. Plaintiff returned to LCF later that day. *See* PageID.376.

On September 26, 2023, PA Ouellette evaluated plaintiff and made the following observations:

39 y/o AA male is s/p cerebral hemorrhage of bilateral frontal lobes and occipital region here to follow-up. Patient discharged from DWH on 09/25/2023. Patient was playing softball when he collided with another prisoner. Patient sent back with rollator for all distances to ensure safe ambulation. Patient released from Physical Therapy. Patient evaluated by OPTO who recommended patient kite when he receives his glasses. Patient has glasses. Will refer to OPTO[.]

PageID.378. PA Ouellette also noted that plaintiff had "Diplopia/Double Vision, Blurred Vision, Changes in Vision" but no pain. *Id*. The treatment plan included an optometry examination on October 11, 2023, noting plaintiff that plaintiff was "s/p head bleed," that plaintiff "[h]as glasses

in possession" and to "[e]valuate for prism."  PageID.380.  The plan also included a chronic care appointment on October 19, 2023 for "asthma, s/p intracranial bleed and gait abnormalities."  *Id*. PA Ouellette also reviewed plaintiff's clinical encounter from the provider at DWH and that he returned to LCF on September 25, 2023.  PageID.381.

Plaintiff attended physical therapy and was discharged by PT Weaver on September 28, 2023.  PageID.382-383.

### 3.    Plaintiff's treatment from October 23, 2023 through June 26, 2024

### a.    PA Ouellette's affidavit

Plaintiff's lawsuit complains of his medical treatment from October 23, 2023 through June 26, 2024.  Compl. at PageID.3. The issue for the Court is whether defendant PA Ouellette was deliberately indifferent to plaintiff's serious medical needs in violation of the Eighth Amendment during that time period.

In her affidavit, which is supported by the medical record, PA Ouellette stated that she evaluated plaintiff twice during the relevant  time period, *i.e.*, on November 9, 2023 and December 12, 2023.  Ouellette Aff. (ECF No. 43, PagID.444).  Plaintiff's complaint does not include allegations against PA Ouellette related to these evaluations.  With respect to plaintiff's vision complaints, PA Ouellette stated that, "I am neither an optometrist nor an ophthalmologist. Primary treatment for optometry services is provided by the Bureau of Health Care Services eye care practitioners." *Id*. at PageID.443.  PA Ouellette also pointed out that "[a]s a medical provider, I do not review or respond to kites," explaining that "[i]f an inmate needs to be seen for a medical issue in between any scheduled appointment, the nursing staff will triage and refer to the appropriate provider if it is medically necessary." *Id*. at PageID.444.  Finally, PA Ouellette stated

that she had no involvement in the medical care of LCF inmates after April 30, 2024, the date her employment ended.[2]

### b.    Plaintiff's medical record

The medical record reflects that plaintiff was awaiting a call-out for his double vision and evaluation for prisms in October and November 2023.  Plaintiff stated that he sent a kite on October 23, 2023, noting that "I was told if my vision doesn't get better by 10-21 to send a kite to medical because it be something else that is wrong with me."  PageID.385.  A nursing note referred to a kite sent on November 1, 2023, with a "NV requested."  *Id.*

On November 2, 2023, RN Katie Tracey stated that plaintiff refused the nursing encounter at the clinic.  PageID.386.  RN Tracey set out the following comments:

> Still having issues from having head injury August 2023  *Ensure officer in area*
> Patient stated he has been awaiting follow-ups in regard to his double vision and
> was to be evaluated for prism. Patient informed follow-ups are soon. He verbalized
> he will continue to wait for callout.

*Id.*

On November 9, 2023, PA Ouellette evaluated plaintiff at the chronic care clinic. PageID.387-391.  At that time,

> Patient reports onset of blurred and double vision with and without glasses x 11
> week [sic] ago. Has not seen eye doctor since returning back to LCF.

---

[2] PA Ouellette's affidavit stated in part,

> Upon the termination of Wellpath's contract with the MDOC on April 30, 2024, my employment ended. I did not seek or accept employment with the successor vendor, VitalCore, nor have I held any position within the Michigan Department of Corrections since that date, I have had no involvement in the medical care of any individuals at Lakeland Correctional Facility after April 30, 2024.

Ouellette Aff. at PageID.444.

PageID.388.  PA Ouellette ordered new medication for "Acute post-traumatic headache, not intractable", lab tests, and a follow-up on December 12, 2023 to "evaluate for speech therapy possible trismus." PageID.390.  PA Ouellette further stated:

> Chronic care in one year. BMP in 90 days. Patient has appointment with OPTO. Acetaminophen 325 mg 2 tabs BID PRN for headaches. Follow-up Dec 2023 to evaluate for speech therapy. Notify healthcare with worsening headaches.

*Id.*

On November 14, 2023, plaintiff saw Dr. Hooker for an optometry evaluation. PageID.392-393.  Dr. Hooker noted, "Still sees double, was going to try fresnell [sic] prism while at DWH but transferred back down here."  PageID.392.  Dr. Hooker also requested an "Optho/Retinal Spec – Consultation" at the Kellogg Eye Center, noting:

> Consult requested in strabismus clinic for diplopia secondary to 08/2023 brain injury. Diplopia has persisted w/left hypertropia and exotropia.

PageID.393.  In addition, an optometry chart review was scheduled for December 7, 2023 to "[c]heck on fresnell [sic] prisms".  *Id.*

On November 28, 2023, plaintiff presented "to have fresnel prism trial w/glasses". PageID.394.  However, the optometrist was unable to adhere the prism to the lenses, with the notation "[k]ept the frames and will try next week." *Id.*

On December 7, 2023, Dr. Hooker dispensed the Fresnel prism, noting

> [Plaintiff]  reported single vision with the prism.  Will have trial the above to see if maintains single vision. F/u in 1 month and determine if should order specs w/the prism.

PageID.395.

On December 12, 2023, PA Ouellette evaluated plaintiff "for speech therapy possible trismus".  PageID.396-399.  In this regard, Ouellette noted plaintiff's continuing vision problem and that the optometrist had referred him to a specialist for further evaluation:

> Patient reports episodic dysphagia. Patient denies choking on his food. Patient continues with mild fatigue of jaw on the right. Patient is improving. Speech is clearer. Patient does have some memory deficits but does not happen often. Patient continues with some difficulty with walking. Denies falls since last visit. Patient continues with blurred and double vision since head injury. OPTO referred patient to Strbismus [sic] clinic for further evaluation.

*Id*.  Plaintiff reported a decrease in frequency and intensity of headaches and was now taking acetaminophen 325 mg 2 tabs at onset of headache.  *Id*.  This was plaintiff's last contact with PA Ouellette during the relevant time period of this lawsuit.

On April 22, 2024, a specialist evaluated plaintiff at the University of Michigan pediatric Ophthalmology and Adult Strabismus Clinic / W. K. Kellogg Eye Center.  PageID.405. Plaintiff discussed treatment options of "ground in prism vs strabismus surgery" and chose surgery, which was performed on June 26, 2024.  PageID.406, 414-415.

### c.    Plaintiff's claim against PA Ouellette

As an initial matter, the record reflects that plaintiff met the objective component of his Eighth Amendment claim during the relevant time period of October 23, 2023 through June 26, 2024.  Plaintiff suffered a serious head injury on August 13, 2023, which affected his eyesight. However, the record does not support plaintiff's claim that this was an emergency situation which lasted for a period of eight months.  Plaintiff received continuous treatment for his vision problems which included the use of a Fresnel prism.  As discussed, plaintiff opted to have corrective surgery in June 2024.

Nevertheless, plaintiff's Eighth Amendment claim fails because he did not establish the subjective component, *i.e.*, that PA Ouellette knew of and disregarded an excessive risk to plaintiff's health or safety.  *See Farmer*, 511 U.S. at 837.  As discussed, PA Ouellette evaluated plaintiff's medical condition twice during the relevant time period, *i.e.*, she saw plaintiff on November 9, 2023 and on December 12, 2023.  During these encounters, PA Ouellette treated

11

plaintiff's headaches and speech problems related to his head injury.  In addition, PA Ouellette monitored plaintiff's eyesight (*i.e.*, blurred and double vision) and noted that these vision problems were being treated by the optometrist and would be evaluated by a specialist at the Strabismus Clinic.  Finally, PA Ouellette had no contact with plaintiff after December 12, 2023.  Nothing in this record indicates that PA Ouellette acted with a "sufficiently culpable state of mind, equivalent to criminal recklessness" in treating plaintiff.  *See Santiago*, 734 F.3d at 591.  "When a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted."  *Rhinehart v. Scutt*, 894 F.3d 721, 743 (6th Cir. 2018) (internal quotation marks omitted).  Accordingly, PA Ouellette should be granted summary judgment on this Eighth Amendment claim.

### III.    Plaintiff's claim against the unknown party

Finally, plaintiff's complaint includes defendant "Unknown Party", sometimes referred to as "(LCF'S) OPTOMETRIST (JOHN DOE)".  *See* PageID.2.  An unidentified defendant or "Doe" defendant listed in a complaint is not a party to a lawsuit. Rather, "Doe defendants are routinely used as stand-ins for real parties until discovery permits the intended defendants to be installed." *Hindes v. FDIC*, 137 F.3d 148, 155 (3rd Cir. 1998) (internal quotation and citation omitted). The failure to identify and serve a Doe defendant constitutes failure to prosecute and warrants a dismissal of that defendant. *See Saucier v. Camp Brighton Prison*, No. 13-15077, 2016 WL 11468926 at *3 (April 26, 2016), *R&R adopted*, 2016 WL 3251761 (E.D. Mich. June 14, 2016).   Here, plaintiff did not identify or serve the "John Doe" defendant.  If the Court adopts this report and grants summary judgment in favor of defendant PA Ouellette, then there will be no other party remaining in this lawsuit. Under those circumstances, plaintiff cannot

maintain a lawsuit against the unserved, unidentified "Unknown Party" / "John Doe" defendant, and this Court should dismiss this defendant without prejudice.

### IV.    Recommendation

For these reasons, I respectfully recommend that defendant PA Ouellette's motion for summary judgment (ECF No. 40) be **GRANTED**, that plaintiff's claim against the unknown party be **DISMISSED** without prejudice, and that the lawsuit be **terminated**.

Dated: April 29, 2026                                    /s/ Ray Kent
                                                         RAY KENT
                                                         United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).